**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MICHAEL JESTER & PENN RIDGE FARMS, LLC,** | : | |
| **Plaintiffs** | : | |
| | : | **No. 1:15-cv-00205** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **ROBERT HUTT & FANTASY LANE THOROUGHBRED RACING STABLE, LLC,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

This matter is before the Court on a motion for partial summary judgment pursuant to Federal Rule of Civil Procedure 56, filed by Plaintiffs Michael Jester and Penn Ridge Farms, LLC with respect to certain counterclaims asserted by Defendants Robert Hutt and Fantasy Lane Thoroughbred Racing Stable, LLC in their answer to Plaintiffs' amended complaint. (Doc. No. 24.) For the reasons provided herein, the Court will grant in part and deny in part Plaintiffs' motion for partial summary judgment.

## I. BACKGROUND

### A. PROCEDURAL HISTORY

Plaintiffs Michael Jester ("Jester"), and Penn Ridge Farms, LLC ("Penn Ridge"), initiated the above-captioned action on January 5, 2015 by filing a complaint against Defendants Robert Hutt ("Hutt") and Fantasy Lane Thoroughbred Racing Stable, LLC ("Fantasy Lane"), in the Court of Common Pleas of Dauphin County, asserting claims of defamation and breach of contract in the non-payment of boarding and breeding services provided to Defendants' thoroughbred stallions and broodmares. (Doc. No. 1.) On January 28, 2015, this action was removed to the United States District Court for the Middle District of Pennsylvania pursuant to

28 U.S.C. § 1441(b). (Id.) Following removal, Defendants filed a motion to dismiss Plaintiffs' defamation claim, which was granted by this Court on February 27, 2015 as unopposed. (Doc. No. 7.) Thereafter, Defendants filed an answer to the complaint together with their counterclaims. (Doc. No. 8.) On March 11, 2016, with concurrence from Defendants, Plaintiffs filed an amended complaint. (Doc. No. 22.) On April 1, 2016, Defendants filed an answer to the amended complaint and incorporated by reference the counterclaims filed with their answer to Plaintiffs' original complaint. (Doc. No. 23.) On April 1, 2016, Plaintiffs answered Defendants' counterclaims. (Doc. No. 23.)

Defendants assert six counterclaims against Plaintiffs. Counts I through IV set forth claims of negligence in the care and treatment of Fantasy Lane horses stabled at Plaintiffs' facilities. (Doc. No. 8 at 5-19.) Count V asserts a breach of contract claim relating to the promotion and management of Fantasy Lane's stallion, "Uptowncharlybrown," and Count VI asserts a breach of fiduciary duty claim arising out of Plaintiffs alleged failure to exercise good faith in promoting, managing, and selling "Uptowncharlybrown's" stallion seasons. (Id. at 19-25.) Plaintiffs have moved for partial summary judgment on these claims. (Doc. No. 24.) Having been fully briefed, this matter is now ripe for disposition.

B. FACTUAL BACKGROUND

The following facts germane to the present motion are either undisputed or viewed in the light most favorable to Defendants, the nonmoving party.[1] Penn Ridge is a horse breeding and

[1] Local Rule 56.1 stipulates that a motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 must be accompanied by a "separate, short, and concise statement of material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1. A party opposing the motion for summary judgment must respond in like manner to the statement of material facts by identifying the genuine issues to be tried. The following relevant facts of record are extracted from Plaintiffs' Rule 56.1 statement of material facts (Doc. No. 25),

boarding facility located in Swatara Township, Pennsylvania. (Doc. No. 25 ¶ 1.) Jester is the owner of Penn Ridge. (Id. at ¶2.) From July 2012 to December 2014, Penn Ridge boarded certain horses owned by Fantasy Lane pursuant to an Agreement entered into by the parties on July 6, 2012. (Doc. No. 28 ¶3.) The Agreement memorialized the intention of the parties to "entice as many mares to book to the stud as possible." (Doc. No. 1-2 at 8.) Commensurate with that stated purpose, the Agreement provided that Penn Ridge would act as Fantasy Lane's agent for the promotion and management of its thoroughbred stallion, "Uptowncharlybrown," and would exercise good faith in promoting, managing, and selling "Uptowncharlybrown's" stallion seasons. (Id.) The Agreement further stipulated that Fantasy Lane would board seven to ten of its own mares at Penn Ridge "on a full time basis to support the stallion." (Id. at 7.) Defendants allege that Plaintiffs did not fulfill their contractual obligations to promote and manage "Uptowncharlybrown's" stallion seasons. According to Defendants, Plaintiffs failed to exercise good faith in securing a successful breeding season for "Uptowncharlybrown" by: ensuring that each of Fantasy Lane's mares stabled at Penn Ridge would be in foal to "Uptowncharlybrown" every year; responding to breeding-related inquiries from other mare owners; and promoting "Uptowncharlybrown" to interested mare owners, in breach of the Agreement. (Doc. No. 27 at 12.)

Additionally, numerous Fantasy Lane horses were injured while stabled at Penn Ridge under the care of Dr. Jeffrey Edelson V.M.D. ("Dr. Edelson").[2] (Doc. No. 27 at 3.) Specifically, several of Fantasy Lane's horses contracted worms and Potomac Horse Fever, with one

---

and Defendants' response thereto (Doc. No. 28), unless otherwise noted. The Court also incorporates facts set forth in other documents of record, where appropriate.

[2] The Agreement required that Fantasy Lane use the services Dr. Edelson for the treatment of its horses while stabled at Penn Ridge.

broodmare, "Queen of Rock," and her unborn foal, succumbing to the disease. (Id.) Furthermore, a weanling named "Nureyev's Ballet 14" suffered a broken leg while separated from its mother and had to be euthanized. (Id.) Consequently, in September of 2014, Hutt, managing partner of Fantasy Lane, (id. ¶ 4), informed Dr. Edelson that Fantasy Lane was contemplating bringing suit against him for his role in treating the Fantasy Lane horses that had become sick or injured while stabled at Penn Ridge. (Doc. No. 25 ¶ 9.) Following negotiations, Hutt and Dr. Edelson entered into a General Settlement and Release Agreement ("Release"), whereby Fantasy Lane agreed to release Dr. Edelson from any and all liability arising out of the care and treatment of Fantasy Lane horses. (Id. ¶¶ 10, 11.) The Release also exculpated "any and all persons, firms, or corporations liable or who might be claimed liable . . . [from liability] arising out of or in any way relating to any and all injures and damages of any and every kind . . . [in] the care and/or treatment of any [Fantasy Lane] horses stabled at Penn Ridge . . . ." (Doc. No. 25-6 at 2.) While Plaintiffs assert that Defendants' negligence counterclaims brought against Plaintiffs are barred by the Release, Defendants contest that Dr. Edelson did not intend to release third-party entities, such as Plaintiffs, from liability. Specifically, Defendants claim that Dr. Edelson procured this Release under fraudulent conditions by misrepresenting to Hutt the nature of certain material revisions made by Dr. Edelson's attorney prior to consummation of the Release, which expanded the scope and substance of the Release. (Doc. No. 28 ¶ 12.)

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). Thus, where no material fact is in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Anderson, 477 U.S. at 248. Conversely, where there is a dispute as to an issue of material fact, the moving party must establish that the factual dispute is not a genuine one. Id.

The party moving for summary judgment bears an initial burden of identifying evidence that it believes demonstrates the absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has carried this initial burden, "the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation marks omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. Celotex, 477 U.S. at 322. With respect to the sufficiency of the evidence that the non-moving party must provide, a court should grant summary judgment where the non-movant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the non-moving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consolidated Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). In deciding a motion for summary judgment, the court need not accept allegations that are merely conclusory in nature, whether they are made in the complaint or a sworn statement. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Moreover, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. Anderson, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." Id.

## III. DISCUSSION[3]

### A. NEGLIGENCE COUNTERCLAIMS (COUNTS I – IV)

Defendants have brought a number of counterclaims against Plaintiffs, alleging negligence in the care and treatment of Fantasy Lane horses while boarded at Penn Ridge. (Doc. No. 8.) Specifically, Count I alleges negligence in failing to control the mayfly population and to vaccinate horses every three months to prevent an outbreak of Potomac Horse Fever, which resulted in the loss of broodmare "Queen of Rock" and her unborn foal, and medical expenses incurred to treat "Ambling Rose." (Id.) Count II alleges negligence in failing to properly monitor weanlings when removed from their mothers, which resulted in the loss of thoroughbred "Nureyev's Ballet 2014." (Id.) Count III asserts negligence in failing to maintain the pastures

[3] Notably, Plaintiffs request that the Court enter partial summary judgment in their favor on Defendants' claims for certain categories of damages that the Defendants have listed in response to Plaintiffs' interrogatories (Doc. No. 25-1 at 7), instead of referring to the specific counterclaims set forth in Defendants' answer to Plaintiffs' amended complaint (Doc. No. 8 at 5-25). As Defendants' list of damages directly correspond with their negligence, breach of contract, and breach of fiduciary duty counterclaims, this Court frames the analysis in terms of the individual counterclaims rather than the damages sought.

and other areas on the premises of Penn Ridge, which resulted in Fantasy Lane's yearlings contracting tapeworm and the loss of "Jean's Diamond," and Count IV asserts negligence resulting in injuries sustained by "Roosevelt Lane" while left unattended at Penn Ridge's facilities. (Id.)

Plaintiffs move for summary judgment on Defendants' negligence-based counterclaims, arguing that such claims are barred by a duly executed Release entered into by Fantasy Lane, Hutt, and Edelson Equine Associates on September 25, 2014. (Doc. No. 26 at 8.) The Release provides, in relevant part:

> I, Robert L. Hutt, for and in consideration of Edelson Equine's reduction of the bill from $9,437.10 to $4,000.00, the sufficiency of which is hereby acknowledged, do hereby release and forever discharge Edelson Equine, its owner, agents, employees, successors and assigns, and their respective heirs, personal representatives, affiliates, successors and assigns, and any and all persons, firms or corporations liable or who might be claimed to be liable, whether or not herein named, none of whom admit any liability to the undersigned, but all expressly denying liability, from any and all claims, demands, damages, actions, causes of action or suits of any kind or nature whatsoever, including any claims for costs, expenses, attorney's fees and disbursements, which I now have or may hereafter have, arising out of or in any way relating to any and all injuries and damages of any and every kind, to both person and property, and also any and all injuries and damages that may develop in the future, as a result of or in any way relating to the care and/or treatment of any [Fantasy Lane] horses stabled at Penn Ridge Stable.
>
> It is understood and agreed that this reduction of the bill is made and received in full and complete settlement and satisfaction of the causes of action, claims and demands mentioned or in any way relating to those mentioned herein; that this Release contains the entire agreement between the parties; and that the terms of this Agreement are contractual and not merely a recital. Furthermore, this Release shall be binding upon the undersigned, and his respective heirs, executors, administrators, personal representatives, successors and assigns.

(Doc. No. 25-6 at 2.) Plaintiffs assert that this general Release absolves them from liability, as it expressly and unequivocally exculpates "any and all persons, firms or corporations liable or who might be claimed liable, whether or not herein named . . . from any and all injuries and damages

of any and every kind . . . relating to the care and/or treatment of any" Fantasy Lane horses stabled at Penn Ridge. (Id.)

In opposition to Plaintiffs' motion for partial summary judgment, Defendants do not challenge the construction or interpretation of the terms of the Release, but rather, attack the validity of the Release by advancing a theory that the Release was procured by fraud. (Doc. No. 27.) Specifically, Defendants argue that the Release was fraudulently obtained through alleged misrepresentations made by Dr. Edelson, the owner and duly authorized representative of Edelson Equine Associates, regarding certain revisions to the Release. (Id. at 7.) Defendants contend that Dr. Edelson secured Defendants' execution of the finalized version of the Release by misrepresenting in an attached cover letter that his attorney made technical revisions to the Release to bring it into compliance with Pennsylvania law, when in actuality, his attorney had substantially modified the terms of the Release by inserting broader exculpatory language releasing unnamed third parties from liability. (Id.)

In an effort to withstand Plaintiffs' motion for summary judgment, Defendants have submitted certain evidentiary materials that they argue create a genuine issue of material fact as to the validity of the Release. Specifically, Defendants produce Hutt's sworn declaration, wherein he attests to the following:

> 4. In September 2014, I was contacted by Dr. Edelson who said he wished to discuss a settlement agreement pursuant to which Fantasy Lane would release him from any liability.
>
> 5. Settlement discussions took place between Dr. Edelson and me and it was agreed that Fantasy Lane would release Dr. Edelson from liability and that in consideration for this, Dr. Edelson would reduce Fantasy Lane's outstanding bill in the amount of $9, 437.10 to $4000.
>
> 6. At Dr. Edelson's request, I drafted a General Release and Settlement Agreement which, consistent with our discussion, provided for a release only of Dr. Edelson and his practice, Edelson Equine, and no other parties. I then

> signed this General Release and Settlement Agreement and sent it to Dr. Edelson for his signature. . . .
>
> 7. On September 25, 2014, Dr. Edelson sent back to me a revised version of the General Release and Settlement Agreement with an accompanying cover letter. . . .
>
> 8. In his cover letter, Dr. Edelson stated that he had shown the agreement to his attorney, "who revised it to include language necessary for such a document in the Commonwealth of Pennsylvania."
>
> 9. Based upon Dr. Edelson's statement in his letter, it was my understanding that his attorney had made only necessary, technical changes and that the agreement had not been changed in any substantive manner. In reliance upon Dr. Edelson's representation, I did not review the revised agreement in detail, believing that it contained the same terms as the agreement that I had drafted and sent to Dr. Edelson, which reflected the agreement we had reached in our discussions, and that only technical changes had been made.
>
> 10. Based upon Dr. Edelson's representations, I did not believe it necessary to further review in detail the version of the agreement which he had sent to me, as it was my understanding that the scope and substance of the agreement had not changed and that the release pertained only to Dr. Edelson and to no other parties.

(Doc. No. 29 at 2-4.) Defendants have also proffered the original and revised versions of the Release, as well as the cover letter prepared by Dr. Edelson accompanying the revised Release, which states, in relevant part:

> I showed your General Release and Settlement Agreement to my attorney who revised it to include language necessary for such a document in the Commonwealth of Pennsylvania. I have attached a copy of the document, which I have signed. It will become effective as soon as you sign it. Please fax me a copy of the document with your signature as soon as you sign it.

(Doc. No. 29 at 10.)

In response, Plaintiffs contend that the evidence produced by Defendants reveals no sufficient indicia of fraud as required to assail the validity of the Release. (Doc. No. 33.) Rather, as Plaintiffs argue, Defendants have attempted to sidestep Hutt's "egregious lack of diligence in failing to review the Release" by claiming fraud. (Id. at 2.) The crux of Plaintiffs'

argument is that Defendants cannot establish that Hutt's reliance on the statement in the cover letter was justifiable given his vast legal experience as a National Claims Manager for CIGNA.

The question presented here is whether Hutt's failure to review the agreement before signing it for the second time is fatal to Defendants' counterclaim.[4] It is well-settled that, when construing the terms of a general release, such as the one at issue here, federal courts in Pennsylvania are guided by Pennsylvania law.[5] Three Rivers Motor Co. v. Ford Motors Co., 522 F.2d 885, 892 (3d Cir. 1975). "[In Pennsylvania, a] signed release is binding upon the

[4] Pennsylvania law governs this diversity action sounding in contract. See Lafferty v. St. Riel, 495 F.3d 72, 76 (3d Cir. 2007) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).

[5] Generally, it is incumbent upon the Court to make a threshold determination of whether the language of the Release is clear and unambiguous, as summary judgment is appropriate only where the contractual terms are not susceptible to two reasonable interpretations. Certain maxims guide this inquiry:

> The fundamental rule in interpreting the meaning of a contract is to ascertain and give effect to the intent of the contracting parties. The intent of the parties to a written agreement is to be regarded as being embodied in the writing itself. The whole instrument must be taken together in arriving at contractual intent. Courts do not assume that a contract's language was chosen carelessly, nor do they assume that the parties were ignorant of the meaning of the language they employed. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.
>
> Only when a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008) (quoting Murphy v. Duquesne Univ., 777 A.2d 418, 429–30 (Pa. 2001)). Here, Defendants do not advance an argument that a genuine issue of material fact exists with respect to the interpretation of the terms of the Release. Thus, the Court interprets the contract as a matter of law and finds that the Release unambiguously releases Plaintiffs from liability as to Defendants' negligence counterclaims.

parties unless executed and procured by fraud, duress, accident or mutual mistake." Id. Indeed, "absent fraud, accident or mutual mistake," a general release will be enforced according to its terms, regardless of how improvident those terms may be or subsequently prove to be for either party. Buttermore v. Aliquippa Hosp., 561 A.2d 733, 735 (Pa. 1989). Pennsylvania law is clear that a failure of the executing party to read the document to which he places his signature does not render the executed agreement invalid or unenforceable unless there exists a showing of fraud. In re Estate of Boardman, 80 A.3d 820, 823 (Pa. Super. Ct. 2013) ("It is well established that, in the absence of fraud, the failure to read a contract before signing it is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract; it is considered supine negligence.") (quotation marks and citations omitted).

"The party claiming fraud has the 'burden to prove that [the] release was procured by fraud and the evidence in proof thereof ha[s] to be clear, precise and indubitable." Scales v. Morgan-Collins, Inc., No. 1193 MDA 2013, 2014 WL 10962326, at *12 (Pa. Super. Ct. May 13, 2014) (quoting Nocito v. Lanuitti, 167 A.2d 262, 263 (Pa. 1961)). Invalidating a release based on a claim of fraud requires proof of the following: "(1) misrepresentation of a material fact; (2) scienter; (3) intention by the declarant to induce action; (4) justifiable reliance by the party defrauded upon the misrepresentation; and (5) damage to the party defrauded as a proximate result." Hunt v. U.S. Tobacco Co., 538 F.3d 217, 225 n. 13 (3d Cir.2008) (quoting Colaizzi v. Beck, 895 A.2d 36, 39 (Pa. Super. Ct. 2006)). Absent such proof[,] a release operates as an 'absolute bar' to any recovery." Popovich v. Empire Beauty Sch., Inc., 567 F. Supp. 1440, 1442 (E.D. Pa. 1983).

Tested against these bedrock principles of contract law, the Court finds that Defendants have failed to adduce evidence of fraud sufficient to invalidate the Release. Indeed, no

reasonable juror could conclude that Hutt was justified in his decision not to review the revised Release in reasonable reliance on statements made in Dr. Edelson's cover letter.[6] The uncontroverted evidence in the record reflects that Hutt, a former National Claims Manager for CIGNA, was "no stranger to the legal process," having obtained releases in "most, if not all" settlements he negotiated. (Doc. No. 25-2 at 12.) Following settlement discussions between Hutt and Dr. Edelson, Hutt drafted a general Release at Dr. Edelson's request. Hutt was alerted via cover letter accompanying a revised Release that Dr. Edelson presented the draft Release to his attorney, "who had revised it to include language necessary for such a document in the Commonwealth of Pennsylvania." (Doc. No. 29 at 10.) As a contracting party to the Release, Hutt was provided an opportunity to know of the character and essential terms of the proposed Release, and in fact, gave the revised Release a cursory review. (Doc. No. 29 ¶ 9 ("In reliance upon Dr. Edelson's representation I did not review the revised agreement in detail, believing that it contained the same terms as the agreement that I drafted . . . .")). Furthermore, while Hutt did not seek legal advice regarding the terms of the revised Release, he did retain counsel during this period for the purpose of evaluating and bringing claims against Penn Ridge and Jester. (Doc. No. 28 ¶¶ 18-21.) While it was Hutt's understanding that Dr. Edelson's attorney "made only necessary, technical changes and that the agreement had not been changed in any substantive manner," (Doc. No. 29 ¶9), a comparative assessment of Hutt's draft Release and the revised Release demonstrates that the inclusions had, in effect, increased the page length of the Release from one page to approximately three pages. (See Doc. No. 29 at 8, 11-13.)

---

[6] The Court recognizes that "justifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction." Toy v. Metro. Life Ins. Co., 928 A.2d 186, 208 (Pa. 2007). However, here, the record evidence as to the nature of the parties, their relationship, and the circumstances surrounding the transaction, provides an insufficient basis upon which a jury could plausibly find reasonable reliance.

Viewing this evidence in the light most favorable to Defendants, and accepting all reasonable inferences drawn therefrom, the Court finds that Defendants' claim of fraud in the procurement of Hutt's signature to the instrument fails as a matter of law, as the record is devoid of evidence from which a reasonably minded juror could conclude that Hutt's reliance on the allegedly fraudulent statement contained in the cover letter justified his failure to thoroughly review the revised Release. Hutt, a legally sophisticated former claims manager, willingly and voluntarily signed a revised Release after receiving notice in the cover letter that certain revisions had been made to the Release, and after having engaged in a cursory review of its content. Hutt's reliance on Dr. Edelson's brief summary of the changes his attorney made to the revised Release does not excuse Hutt's failure to read the revised Release, especially when considering his previous experience as a claims manager, his understanding that the cover letter's mention of edits made to the Release was drafted by a veterinarian (not an attorney), and the obvious nature of the alterations made to the Release as demonstrated by the increased page length. In sum, Defendants cannot avoid the effect of the Release "upon the ground that at the time [Hutt] signed the paper he did not read it or know its contents, but relied on what another said about it." Seaton v. East Windsor Speedway, Inc., 582 A.2d 1380, 1383 (Pa. Super. Ct. 1990) (quoting 66 Am. Jur. 2d Release § 15 (1973)).

Accordingly, because the Release operates as a bar to Defendants' negligence counterclaims, the Court will grant the motion for partial summary judgment in Plaintiffs' favor on Counts I, II, III, and IV.

B. BREACH OF CONTRACT (COUNT V) & BREACH OF FIDUCIARY DUTY (COUNT VI) COUNTERCLAIMS

Defendants have also asserted a breach of contract counterclaim and a breach of fiduciary duty counterclaim arising out of the Agreement entered into on July 6, 2012 by Fantasy Lane and

Penn Ridge regarding the promotion and management of Fantasy Lane's stallion "Uptowncharlybrown." (Doc. No. 8 at 19-25.)

The July 6, 2012 Agreement at issue here states as follows:

TERMS:

Boarding Fees:

Mares: $25.00 a day.

Part of the agreement for standing the stallion Uptowncharlybrown is that Fantasy Lane will agree to board 7-10 mares at Penn Ridge Farms on a full time basis to support the stallion.

* * *

STUD FEES:

Uptowncharlybrown:

Advertised Standing Price for 2013: $1,500.00

* Stud Fees charged at the Stallion Manager's Penn Ridge Farms and Fantasy Lane's discretion. With the main purpose to entice as many mares to book to the stud as possible. Stud fees collected by Penn Ridge Farms will be distributed in June and December of the year the mares foal.

STALLION CHARGES AND FEES:

Board: $1,500.00 per month

Comp. Breedings: Six for Penn Ridge Farms.

AGENCY:

Penn Ridge Farms will act as Fantasy Lane's agent for the promotion and management of Uptowncharlybrown's stallion seasons, and shall exercise its utmost good faith to promote, manage and sell Uptowncharlybrown's stallion seasons and develop a budget.

(Doc. No. 29 at 16.) Defendants' counterclaims are grounded on allegations that Plaintiffs mismanaged and failed to promote "Uptowncharlybrown's" stallion seasons and neglected to register certain Fantasy Lane's horses.

Plaintiffs seek summary judgment as to Defendants' breach of contract and breach of fiduciary duty counterclaims on the basis that the record contains no evidence substantiating Defendants' allegations that Fantasy Lane's horses were not properly managed, promoted, and registered. (Doc. No. 26 at 10.) In support of their motion for partial summary judgment on Defendants' claim that Plaintiffs mismanaged and failed to promote "Uptowncharlybrown," Plaintiffs cite to the transcript from Hutt's deposition, wherein Hutt testifies that he is unable to identify any mare owner who could testify that he was steered away from "Uptowncharlybrown" for breeding. (Doc. No. 25-3 at 46-47.) Moreover, as it relates to Defendants' claim that Plaintiffs failed to register a number of foals owned by Fantasy Lane with the Jockey Club and the Pennsylvania Horse Breeders Association, Plaintiffs point to an excerpt from Hutt's deposition testimony where he concedes that any damages incurred as a result of Plaintiffs' purported failure to register Fantasy Lane foals would be "subjective." (Doc. No. 25-4 at 36.)

In opposition to Plaintiffs' summary judgment motion, Defendants argue that they have adduced sufficient evidence to create a genuine issue of material fact precluding summary judgment on these counterclaims. (Doc. No. 27 at 11.) Specifically, Defendants produce Hutt's sworn declaration in which he offers the following explanation regarding his understanding of the terms of the Agreement, the customary management and promotion practices for stallions, and the failure on the part of Plaintiffs to adhere to the Agreement:

> 15. Under the agreement entered into between Fantasy Lane and Penn Ridge, it was the intention to breed "Uptowncharlybrown" as often as possible to mares owned by Fantasy Lane as well as to other mares.

> 16. This is a common practice in the Thoroughbred racing industry to increase the value of a stallion. The goal is to have offspring with successful racing careers which will then result in greater demand and higher prices for the stallion's future stallion seasons.
>
> 17. Fantasy Lane stabled mares at Penn Ridge to support the stallion "Uptowncharlybrown" and it was expected that each of these mares would be in foal to "Uptowncharlybrown" every year.
>
> 18. During the 2013 breeding season, all of Fantasy Lane's mares were bread to "Uptwoncharlybrown" and were in foal.
>
> 19. In 2014, I learned that only 40% of Fantasy Lane's mares were in foal, as a result of Penn Ridge's failure to make sure that the necessary breedings were taking place.
>
> 20. I subsequently brought this to Penn Ridge's attention and while some corrective action was taken, it was too late to salvage the 2014 breeding season for "Uptowncharlybrown."
>
> 22. On July 25, 2014, I received an e-mail from Brian Montefusco, the owner of the mare, "Rainbow," who stated that he had wanted to breed his mare to "Uptowncharlybrown" and had contacted Penn Ridge on numerous occasions to arrange it but that Penn Ridge had been unresponsive to his inquires. . . .

(Doc. No. 29 at 5-6.) Together with Hutt's sworn declaration, Defendants attach the e-mail sent to Hutt from Brian Montefusco, notifying Hutt that Penn Ridge neither returned his numerous calls nor responded to his e-mails inquiring into breeding his mare, Rainbow, to "Uptowncharlybrown." (Doc. No. 29 at 20.) Furthermore, Defendants refer to Hutt's deposition testimony in which Hutt estimates that he is entitled to damages approximating $60,000.00 for the failure to register foals with the Jockey Club and Horse Breeders Association, which deprived him of the option of selling them as yearlings and collecting the proceeds of each sale, and resulted in him incurring additional expenses for training and maintenance at a rate of $2,000.00 per month for each foal. (Doc. No. 25-4 at 36-37.)

Having considered the arguments presented in the parties' respective briefs, and having parsed through the evidentiary record, the Court finds that Defendants have produced evidence

creating a genuine issue of material fact as to Plaintiffs' failure to manage and promote "Uptowncharlybrown," and their failure to register Fantasy Lane's foals. Specifically, Defendants have advanced sufficient controverted evidence in the form of Hutt's sworn declaration and Brian Montefusco's e-mail that create a genuine issue of material fact as to whether Plaintiffs met their contractual obligations to breed "Uptowncharlybrown" with Fantasy Lane's mares and to maximize the stallion's reproductive season by promoting "Uptowncharlybrown" to other mare owners. Moreover, the Court declines Plaintiffs' invitation to conclude that Defendants' claim for damages, stemming from the failure to register Fantasy Lane foals, is "subjective" or speculative. Under Pennsylvania law, "[d]amages are speculative if the uncertainty concerns the fact of damages[,] not the amount." Carroll v. Phila. Housing Auth., 650 A.2d 1097, 1100 (Pa. Commw. Ct. 1994). Indeed, the amount of damages need not be made with "mathematical certainty, but only reasonable certainty, and evidence of damages may consist of probabilities and inferences." Molag, Inc. v. Climax Molybdenum Co., 637 A.2d 322, 324 (Pa. Super. Ct. 1994) (quoting Delahanty v. First Pa. Bank, N.A., 464 A.2d 1243, 1257–58 (1983)). Here, Defendants' excerpt of Hutt's deposition testimony concerning the nature of Hutt's damages belies Plaintiffs' argument that no evidence exists to support the fact of damages. Rather, this deposition testimony calls into question the amount of damages suffered by Defendants due to Plaintiffs' purported failure to properly register Fantasy Lane's foals. As the amount of damages incurred by Defendants concerns a question of fact for the jury, the Court will deny Plaintiffs' motion for partial summary judgment on Counts V and VI.

## IV. CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Plaintiffs' motion for partial summary judgment. (Doc. No. 24.) Plaintiffs' motion for partial summary judgment will

be granted as to Defendants' negligence counterclaims (Counts I-IV), and will be denied as to Defendants' breach of contract counterclaim (Count V) and breach of fiduciary duty counterclaim (Count VI). An appropriate Order follows.