IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL JESTER and** | : | |
| **PENN RIDGE FARMS, LLC.,** | : | No. 1:15-cv-00205 |
| **Plaintiffs** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **ROBERT HUTT, et al,** | : | |
| **Defendants** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DOUGLAS H. DUER, ESQ.,** | : | |
| **COMMONWEALTH OF PA,** | : | |
| **DEPARTMENT OF AGRICULTURE,** | : | |
| **OFFICE OF CHIEF COUNSEL,** | : | |
| **Garnishee** | : | |

## MEMORANDUM

The above-captioned action is before the Court on remand from the United States Court

of Appeals for the Third Circuit for a determination as to whether the jury's award of punitive

damages is constitutionally excessive.  (Doc. No. 111-2.)  Also before the Court is Plaintiffs'

motion for supplemental relief in aid of execution pursuant to Federal Rule of Civil Procedure

69.  (Doc. No. 115.)  For the following reasons, the Court declines to reduce the jury's punitive

damages award and will deny Plaintiffs' motion for supplemental relief in aid of execution.

## I.    BACKGROUND[1]

Plaintiffs Michael Jester ("Jester") and Penn Ridge Farms, LLC ("Penn Ridge"), initiated

the above-captioned action by filing a complaint against Defendants Robert Hutt ("Hutt") and

---

[1]  Because the parties are familiar with the background of this case, the Court will recite only an
abbreviated version of the factual and procedural history.  The Court adopts by reference the
more comprehensive procedural and factual background contained in the Court's previous
memoranda.  (Doc. Nos. 42, 96.)

Fantasy Lane Thoroughbred Racing Stable, LLC ("Fantasy Lane"),[2] in the Dauphin County

Court of Common Pleas on January 5, 2015.  (Doc. No. 1.)  The case was removed to this Court

on January 28, 2015, pursuant to 28 U.S.C. § 1441(b).  (Id.)  Plaintiffs filed an amended

complaint on March 11, 2016, asserting claims of defamation and breach of contract.  (Doc. No.

22.)  On April 1, 2016, Defendants filed an answer to Plaintiffs' amended complaint and asserted

counterclaims of negligence, breach of contract, and breach of fiduciary duty.  (Doc. No. 23.)

Plaintiffs filed a motion for partial summary judgment (Doc. No. 24), which the Court granted as

to Defendants' negligence counterclaims (Doc. Nos. 43-45).  Following a three-day jury trial

held in February 2018, the jury found in favor of Plaintiffs and awarded $200,000 in damages:

$100,000 for breach of contract; and $1 in nominal damages and $89,999 in punitive damages

for defamation.  (Doc. Nos. 68-70, 74.)  The jury found against Defendants as to their

counterclaims.  (Id.)

One month after the trial, Defendants filed a post-trial motion for a new trial or remittitur

or, in the alternative, to alter or amend the judgment pursuant to Rules 59(a) and 59(e), which

motion the Court granted in part and denied in part.  (Doc. Nos. 78, 96-97.)  The Court declined

to grant Plaintiffs a new trial or reduce the $110,000 awarded for breach of contract but found

that the jury's punitive damages award was unconstitutionally excessive and reduced it to

$5,500.  (Doc. Nos. 96-97.)  Defendants appealed, and Plaintiffs filed a cross-appeal challenging

the reduction of the punitive damages award.  (Doc. Nos. 100, 103, 111-2 at 5-6.)  On August 28,

2019, the Third Circuit vacated this Court's reduction of Plaintiffs' award and remanded the case

to this Court to reevaluate that award consistent with the directives set forth in its opinion.  See

_____

[2] Although Plaintiffs initially named a single defendant – Fantasy Lane Thoroughbred Racing
Stable, LLC – the parties later stipulated to amend the caption to include two additional
defendants: Fantasy Lane Stable, Inc., and Fantasy Lane Thoroughbreds.  (Doc. Nos. 65-66.)
For purposes of this Memorandum, Fantasy Lane refers to all three of these related entities.

Jester v. Hutt, 937 F.3d 233, 243 (3d Cir. 2019) (holding that the Court erred by using a ratio that compared the $1 in nominal damages awarded for defamation to the $89,999 in punitive damages awarded for the same); (Doc. No. 111-2).[3]

In October 2019, Plaintiffs filed a motion for supplemental relief in aid of execution pursuant to Federal Rule of Civil Procedure 69.  (Doc. No. 115.)  This motion was precipitated by Plaintiffs' unsuccessful post-trial attempts to collect the judgment awarded in their favor and against Fantasy Lane.  (Id.)  Specifically, because Fantasy Lane had not requested a stay of execution or posted a bond and had closed its bank account, Defendants sought recovery through other avenues, namely by inquiring with the Pennsylvania Department of Agriculture ("DOA") about award funds owed to Fantasy Lane through the "Pennsylvania Bred" program ("PA-Bred").  (Id. at 2-3.)  The PA-Bred program "offers monetary awards to horses [registered with the Pennsylvania Horse Breeders Association ('PHBA')] with winning track records that were bred in Pennsylvania."  (Id. at 2.)  Attempting to collect the judgment through these awards, Plaintiffs served the DOA with interrogatories in aid of attachment and filed a praecipe for writ of execution.  (Doc. Nos. 87-88, 115 at 3.)  The Clerk of Court issued the writ of execution and directed the United States Marshal to serve it upon the DOA, which is now a garnishee in this action.  (Doc. Nos. 89, 95 at 2-3, 105.)  The DOA answered the interrogatories, asserting that the DOA, through its State Horse Racing Commission ("Commission"), "does not 'owe' any money and is not liable to [Fantasy Lane]" – rather, Fantasy Lane, as the listed "breeder of various Pa-bred registered thoroughbred horses who participated in races at racetracks within the

---

[3] Additionally, the Third Circuit affirmed the Court's Order (Doc. Nos. 43-45) granting partial summary judgment in favor of Plaintiffs and post-trial Order (Doc. Nos. 96-97) to the extent that it denied Defendants' requests for a new trial and a reduction of the breach of contract award. (Doc. No. 111-2 at 17.)

Commonwealth," was entitled to various breeder awards.  (Doc. No. 95.)[4]  Fantasy Lane thereafter informed the DOA of its belief that "the award moneys were not the property of [Fantasy Lane] . . . ."  (Doc. No. 118 at 3.)

In May 2019, the DOA filed a letter with the Court seeking guidance concerning the parties' competing claims to the awards.  (Doc. No. 107.)  The DOA indicated that the Commission would hold the awards, which "would have been paid to [Fantasy Lane] but for the judgment issued against that company."  (Id. at 1.)  The DOA explained that the award moneys "represent breeder[] and stallion awards which would have been paid to [Fantasy Lane] from April 2018 through September 2018."  (Id. at 1.)  The DOA's letter also reflects Fantasy Lane's "position that the monies being held, although due to be paid to [Fantasy Lane], are not, in fact, the property of [Fantasy Lane] but are the property of the actual owners of the horses which earned the awards."  (Id. at 1) (noting that, "[a]ccording to [Fantasy Lane], when these funds are received by [Fantasy Lane] as the owner's representative, they are immediately passed through to the owners, minus a small commission").  In light of the DOA's letter, Plaintiffs filed their pending motion for supplemental relief in aid of judgment.  (Doc. No. 115.)[5]

---

[4] The DOA also detailed relevant aspects of the Race Horse Industry Reform Act, which, inter alia:  (1) empowered the Commissioner to regulate and oversee the operations of the horse racing industry and the conduct of pari-mutuel wagering, see 3 Pa.C.S. § 9331; (2) established a "State Racing Fund" in the State Treasury, see 3 Pa.C.S. § 9334(a); (3) created a restricted account within the State Racing Fund, known as the "Pennsylvania Breeding Fund," consisting of moneys deposited pursuant to section 9334 of the Act, see 3 Pa.C.S. § 9336(a); and (4) provided that statutory percentages from winnings of race purses would be distributed from the Pennsylvania Breeding Fund as awards for Pennsylvania-bred horses duly registered with the PHBA and qualified to participate in the PA-Bred program, see 3 Pa.C.S. § 9336(b).  (Doc. No. 95 at 1-2.)

[5] In October 2019, the parties conducted a post-judgment deposition of Hutt for purposes of determining whether and to what extent Fantasy Lane owns the PA-Bred funds subject to the judgment, and whether Plaintiffs are entitled to an order directing the DOA to pay those funds to Plaintiffs.  (Doc. No. 118 at 17-40.)

Because both the reevaluation of the punitive damages award and the Rule 69 relief request have been fully briefed (Doc. Nos. 116, 118-122), both issues are ripe for disposition.

## II.    REEVALUATION OF THE PUNITIVE DAMAGES AWARD

### A.    Legal Standard

Rule 59(e) permits the Court to alter or amend a judgment upon the filing of a motion. See Fed. R. Civ. P. 59(e) ("A motion to alter or amend a judgment must be filed no later than 28 days after the entry of a judgment.").  A party is entitled to have a court alter or amend a judgment in the following circumstances: "(1) an intervening change in the controlling law; (2) the availability of new evidence . . . ; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  See Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (citing N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).

As the Court explained in initially reducing the jury's punitive damages award, under Pennsylvania law, "punitive damages are proper when a person's actions are of such an outrageous nature as to demonstrate intentional, willful, wanton, or reckless conduct."  See SHV Coal v. Cont'l Grain Co., 587 A.2d 702, 704 (Pa. 1991).[6]  In BMW of North America, Inc. v. Gore, 517 U.S. 559, 560-61 (1996), and State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 419 (2003), the United States Supreme Court set forth three guideposts for evaluating the reasonableness of an award of punitive damages, two of which are: (1) the degree of reprehensibility of the defendant's misconduct; and (2) the disparity between the actual

---

[6] Punitive damage awards are evaluated on the basis of the following factors: "(1) the character of [defendant's] act; (2) the nature and extent of the harm [done to the plaintiff]; and (3) the wealth of the defendant."  See Pioneer Comm. Funding Corp. v. Am. Fin. Mortg. Corp., 797 A.2d 269, 290 (Pa. Super. Ct. 2002).

or potential harm suffered by the plaintiff and the punitive damages award.[7]  See Campbell, 538

U.S. at 409 (citing Gore, 517 U.S. 559, 575).  However, as the Third Circuit explained in

remanding this case, resort to the second guidepost – which directs courts to consider the ratio

between actual and punitive damages – is not useful in cases involving nominal damages awards.

See Jester, 937 F.3d at 242.  Rather, in such cases, courts should focus on reasonableness, "the

touchstone for constitutional scrutiny of punitive damages awards."  See id. at 243.

### B.  Arguments of the Parties

Defendants argue that "this Court should find that the punitive damage award was

excessive and should make a reduction in the amount awarded."  (Doc. No. 119 at 2.)

Defendants argue that, in conducting the two-step analysis provided by the Third Circuit, the

Court should readopt the reprehensibility analysis from its previous memorandum in the first

step.  (Id. at 5-6.)  Defendants next identify nine cases that they assert fall into the category of

cases to which the Court should compare the punitive damages award in the second step of its

analysis.  (Id. at 6-10.)[8]  Defendants assert that because the punitive damages awarded in those

---

[7] The third guidepost is the difference between the punitive damages awarded and civil penalties authorized or imposed in comparable cases. But that guidepost is not instructive in claims, as here, for common law defamation.  See Jester, 937 F.3d at 241.

[8] These cases include: Celle v. Fillipino Reporter Enters., 209 F.3d 163 (2d Cir. 2000) ($1 nominal, $10,000 punitive); Buckley v. Littell, 539 F.2d 882, 897 (2d Cir. 1975) ($1 compensatory, $1,000 punitive); In re Ginn, No. 09-32221, 2013 WL 832654, at *4 (Bankr. S.D. Tex. Mar. 6, 2013) ($250 nominal, $1,000 punitive); Fischer v. OBG Cameron Banfill LLP, 08-770, 2010 WL 3733882, at *4 (S.D.N.Y. Sept. 24, 2010) ($1 compensatory, $7,500 punitive); Gregg v. Ham, 678 F.3d 333, 338 (4th Cir. 2012) ($1 nominal, $20,000 punitive for assault and trespass, with an additional $30,000 in punitive damages on a civil rights claim); Haines v. Salazar, JVR No. 447185, 2000 WL 35360881 (Tulsa County District Court (Okla.) 2000) ($1 nominal, $20,000 punitive); Shifflett v. Food Lion, Inc., 1999 Dolan Media Jury Verdicts LEXIS 5531 (Circuit Court of Virginia, Albemarle County 1999) ($0 compensatory, $1 punitive); Bailey v. Bailey, JVR No. 177387, 1996 WL 31373 (Florida Circuit Court, Escambia County 1996) ($1 substantive, $1 punitive); and Mills v. Ellerbee, JVR No. 74467, 1991 WL 475040 (Georgia Superior Court, Cobb County 1991) ($1 nominal, $26,920 punitive).

cases range from $1 to $26,920, the Court should use that range as its guidepost.  (Id. at 10.)

Defendants maintain that because the Court already determined that there was a minimal degree

of reprehensibility in this case, it should find that a punitive damages award at the lower end of

that range is appropriate.  (Id. at 10-11.)

Plaintiffs argue that the jury's punitive damages award is reasonable and that the Court

should decline to reduce it as unconstitutionally excessive.  (Doc. No. 121.)  Plaintiffs refer the

Court to six additional cases that they deem appropriate for the Court's consideration.[9]  (Id. at 3-

4.)  Plaintiffs assert that the Court should particularly consider Tanner, discussed infra, in which

the Alabama Court of Civil Appeals determined that a jury's punitive damages award of

$310,000 (later reduced to $160,000 due to a statutory cap) was not unconstitutionally excessive,

given the factual similarities it shares with the instant case.  (Id. at 4-5); see Tanner, 88 So.3d at

861-62, 881.  Plaintiffs argue that although juries in other cases reached differing amounts as to

their punitive damages awards, "ultimately, this Court must itself consider whether this jury's

punitive damages award, based on the facts of this case, and the reprehensibility of these

Defendants' conduct, is unconstitutionally excessive."  (Doc. No. 121 at 5.)  They assert that

other cases demonstrate that "seemingly isolated internet postings can trigger devastating 'piling

on' that can be very harmful to a business operating in a small community" and contend that the

jury reached an appropriate damages award after hearing the full context of Defendants'

---

[9] These cases include: Keehr v. Consol. Freightways of Del., Inc., 825 F.2d 133 (7th Cir. 1987) ($2 nominal, $50,000 punitive); The Fireworks Restoration Co., LLC v. Hosto, 371 S.W.3d 83 (Mo. Ct. App. 2012) ($1 actual, $150,000 punitive); Tanner v. Ebbole, 88 So.3d 856 (Ala. Civ. App. 2011) ($1 nominal against each defendant, $310,000 punitive, although the $200,000 punitive award against the LLC defendant was reduced to $50,000 due to a statutory cap); Howard Univ. v. Wilkins, 22 A.3d 774 (D.C. App. Ct. 2011) ($1 compensatory, $42,677 punitive); Diversified Water Division, Inc. v. Standard Water Control Sys., Inc., No. A07-1828, 2008 WL 4300258 (Minn. Ct. App. Sept. 23, 2008) ($0 compensatory, $30,000 punitive); and Marcus v. Funk, Civ. A. No. 87C-SE-26-1-CV, 1993 WL 141864 (Del. Super. Ct. Apr. 21, 1993) ($1 non-punitive, $37,000 punitive).

statements.  (Id. at 6-7) (citing Meyers v. Certified Guar. Co., LLC, 221 A.3d 662 (Pa. Super. Ct. 2019); Tanner, 88 So.3d 856).  Plaintiffs conclude that because "[n]o analogous case law supports a finding that th[e] punitive damages award is unreasonable," the Court "should conclude that the punitive damages award is not unconstitutionally excessive and does not warrant any reduction."  (Id. at 7.)

In response, Defendants argue that the cases cited by Plaintiffs are not appropriate for consideration in the Court's analysis.  (Doc. No. 122 at 2.)  They argue that Keehr and Marcus should not be considered because those cases were decided before BMW North America Inc. v. Gore, 517 U.S. 559 (1996), and therefore do not reflect the degree-of-reprehensibility analysis outlined by the Supreme Court in that case.  (Id. at 2.)  They further contend that Howard is not appropriate for comparison because the defamation claim in that case was actually dismissed before trial, and the award was associated with a sexual harassment retaliation claim.  (Id. at 3.)  Defendants distinguish the remaining three cases cited by Plaintiffs – Tanner, Hosto, and Diversified Water – based on the contention that the defendants in those cases were found to have been highly reprehensible.  (Id. at 3-4.)  Defendants reiterate that because of the Court's prior determination that this case involved a minimal degree of reprehensibility, "a punitive damage[s] award of no greater than $5,500 would be appropriate."  (Id. at 5.)

C.    Whether the Court Should Reduce the Jury's Punitive Damages Award

In the decision remanding this action to this Court, the Third Circuit stated that "[i]n reevaluating the award on remand, the District Court should consider the reprehensibility of Hutt's conduct and compare the $89,999 award to those in defamation or other dignitary tort cases that do not involve physical harm."  See Jester, 937 F.3d at 243; (Doc. No. 111-2 at 16-17). The Third Circuit further advised that, because the Court must accord a level of deference to the

decision of the jury, "if the District Court finds that the $89,999 punitive damages award is unconstitutionally excessive, it should explain why that amount is not within the range of reasonable punitive damages for this type of claim and why a lower award properly reflects the reprehensibility of Hutt's conduct." See Jester, 937 F.3d at 243; (Doc. No. 111-2 at 17).

In assessing the degree of reprehensibility of conduct in this case – the first step of the framework provided by the Third Circuit – the Court notes the Supreme Court's position that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." See Gore, 517 U.S. at 575. Reprehensibility is measured by considering whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Campbell, 538 U.S. at 419.

Neither party challenges the Court's prior degree-of-reprehensibility determination in their post-remand briefing, nor did the Third Circuit indicate that the Court erred in making that determination. As the Court previously noted, no physical harm befell Plaintiffs as a result of Defendant Hutt's conduct;[10] there was no evidence that Hutt acted indifferently to or with reckless disregard of the health or safety of others; and the record did not establish a pattern of culpable misconduct directed at other parties. (Doc. No. 96 at 10-11) (citing Inter Med.

---

[10] As for the relevant conduct, Defendant Hutt "sent several emails to others in the horse-breeding industry expressing his dissatisfaction with Penn Ridge owner Michael Jester and the treatment of Fantasy Lane's horses." See Jester, 937 F.3d at 236. Hutt blamed Penn Ridge for the deaths of its horses, labeled the staff "inexperienced" and deserving of "no faith," accused Penn Ridge of attempting to conceal and coverup the horses' deaths and other problems, and described Jester as someone "who would say or do anything to save his ass," among other things. See id. at 237.

Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 467 (3d Cir. 1999) (recognizing that

economic torts are "less worthy of large punitive damages awards than torts inflicting injuries to

health or safety"); CGB Occupational Therapy, Inc. v. RHA Health Servs., Inc., 499 F.3d 184,

191 (3d Cir. 2007) (stating that "[t]he repeated conduct subfactor will necessarily have less force

where the defendant's misconduct did not extend beyond his dealings with the plaintiff . . ."

(internal quotation marks omitted)).  However, the Court further noted that Plaintiffs were in a

financially vulnerable position given the nature of their industry and that Hutt had intentionally

sent the defamatory e-mails.  (Doc. No. 96 at 11-12.)  While the Court observed that the

defamatory e-mails were limited in scope and sent over a short span of time (id. at 11), Jester

testified that the emails reached hundreds of recipients and precipitated a sharp decline in Penn

Ridge's business (Doc. No. 121-2 at 2-4).  The emails may have been limited in scope insofar as

they were sent only to individuals involved in the industry, but the industry itself is relatively

small, and the resulting impact on Penn Ridge's business was not insignificant.  Accordingly, on

balance, assessment of the relevant considerations establishes a minimal to moderate level of

reprehensibility.

The Third Circuit next instructed the Court to "compare the $89,999 award to those in

defamation or other dignitary tort cases that do not involve physical harm."  (Doc. No. 111-2 at

16-17.)  As evidenced by the low number of cases identified in the parties' briefing (Doc. Nos.

119, 121, 122), there does not appear to be an abundant pool of case law from which to draw

comparison.  Yet, Plaintiffs have provided cases that support a range of punitive damages awards

that, on the high end, far exceeds the amount of punitive damages awarded here.  For example, in

Hosto, the Court of Appeals of Missouri affirmed a punitive damages award of $150,000 against

a defendant who had posted three defamatory online reviews about the plaintiff's restoration

work under guise of prior customers' names.  See Hosto, 371 S.W.3d at 86.  Although the court

did not specifically characterize the degree of reprehensibility as high or low, it noted that the

defendant had engaged in repeated defamatory conduct, having sent more than one email, and

had done so intentionally because "he was 'bitter and wanted revenge.'"  See id. at 92.  Another

example is Tanner, discussed supra, where defendants had defamed a plaintiff tattoo-parlor

owner by stating that the plaintiff-owner had communicable diseases and exposed her customers

to such diseases.  See Tanner, 88 So. 3d at 861.  The jury's award of punitive damages exceeded

$300,000 and, even when reduced due to Alabama's statutory cap on punitive damages against

small business, totaled $160,000.  See id. at 861-862, 881.

Even considering the lower end of the range of appropriate damages, Plaintiffs have

provided support for an award of punitive damages that, when adjusted for inflation,[11] exceeds

$35,000.  This was the case in Diversified Water, where a business competitor defamatorily

advised a mutual prospective customer that the plaintiff "used substandard products, would not

stand behind its warranty, was unreliable, acted in bad faith, and was generally a 'sleazy'

company."  See Diversified, 2008 WL 4300258, at *2.  Indeed, Defendants rely on cases, such as

Haines and Mills, involving inflation-adjusted awards in excess of $40,000.  See Haines, 2000

WL 35360881; Mills, 1991 WL 475040.  As a floor to the general range of appropriate damages,

these cases suggest an amount much higher than the $5,500 that Defendants urge the Court to

accept as the appropriate amount of punitive damages here.

While the degree of reprehensibility of the defendants' conduct in some of these cases

---

[11] See CPI Inflation Calculator, Bureau of Labor Statistics ("BLS"), https://data.bls.gov/cgi-bin/cpicalc.pl (last visited Sept. 15, 2019); see, e.g., Burke v. Regalado, 935 F.3d 960, 1039-40 (10th Cir. 2019) (relying on inflation-adjusted dollars in evaluating punitive damages awards to determine whether an award was unprecedented for specific conduct).  According to the BLS's calculator, the awards in Hosto and Tanner are worth about $172,000 and $118,000, respectively, in inflation-adjusted dollars.

may be somewhat higher than that of Hutt in this case, the substantially higher punitive damages awarded in Hosto and Tanner – particularly when adjusted for inflation to accurately reflect present-day values – were affirmed as not unconstitutionally excessive.  Further, the Court has been unable to locate any cases of the relevant class in which a court has determined that a punitive damages award was unconstitutionally excessive.  Given the Court's obligation to show deference to the jury's verdict and the lack of comparative cases suggesting that the jury's punitive damages award of $89,999 is unconstitutionally excessive, the Court declines to reduce the jury's award.[12]

## III.    RULE 69 MOTION

### A.    Legal Standard

Rule 69 of the Federal Rules of Civil Procedure "governs proceedings in aid of execution and directs that such proceedings shall take place in accordance with the state in which the District Court sits – Pennsylvania, in this case – except that any federal statute governs to the extent that it is applicable."  See Savitsky v. Mazzella, 93 F. App'x 439, 441 (3d Cir. 2004) (citing Fed. R. Civ. P. 69); see also T. Levy Assocs., Inc. v. Kaplan, No. CV 16-4929, 2017 WL 7693510, at *2 (E.D. Pa. Aug. 21, 2017) (noting that, "[w]hen conducting post-judgment

---

[12]   In reaching range of permissible punitive damages, the Court has focused on cases wherein the reprehensibility analysis is made explicit.  While the Third Circuit did not instruct the Court to so limit its analysis, the Third Circuit's reasoning supports that approach.  If the Court were to look to comparable cases in which courts did not determine reprehensibility in line with Gore, a starting point would be Sondesky v. Cherry Scaffolding, Inc., No. 2:16-cv-05667 (E.D. Pa. 2019); see (Doc. Nos. 119 at 7 n.1, 121-1, 121 at 2 n.1).  Sondesky challenged a $100,000 punitive damages award based on the argument that there were no compensatory damages awarded upon which to base the punitive damages.  See Sondesky, No. 2:16-cv-05667, at *7.  The court rejected that argument, but it did not reach the issue of whether the punitive damages were unconstitutionally excessive because the defendants had not raised and therefore waived the issue.  Sondesky, No. 2:16-cv-05667, at *7 n.3.  Sondesky is currently on appeal to the United States Court of Appeals for the Third Circuit, see Sondesky v. Ellis, No. 19-2900 (3d Cir.), but as it stands, it supports the jury's award in this case.

execution proceedings, [courts] are governed by Pennsylvania's execution procedures").

Disposition of Plaintiffs' motion therefore turns on application of Rule 3118 of the Pennsylvania

Rules of Civil Procedure.  See Savitsky, 93 F. App'x at 441 (citing Pa. R. Civ. P. 3118).  Rule

3118 "permits summary proceedings in aid of execution in order to maintain the status quo as to

the judgment debtor's property, and it is limited to property solely owned by the judgment

debtor."  See Savitsky, 93 F. App'x at 441 (citing Pa. R. Civ. P. 3118).[13]  "Only property the title

to which is clearly in the judgment-debtor is subject to the terms of th[e] paragraphs [in Rule

3118(a)]."  Greater Val. Terminal Corp. v. Goodman, 202 A.2d 89, 92-93 (Pa. 1964).  The

judgment creditor bears the burden of establishing "'(1) the existence of an underlying judgment;

---

[13]  Subdivision (1) of Rule 3118(a) provides:

> (a) On petition of the plaintiff, after notice and hearing, the court in which a judgment has been entered may, before or after the issuance of a writ of execution, enter an order against any party or person
>
> > (1) enjoining the negotiation, transfer, assignment or other disposition of any security, document of title, pawn ticket, instrument, mortgage, or document representing any property interest of the defendant subject to execution;
> >
> > (2) enjoining the transfer, removal, conveyance, assignment or other disposition of property of the defendant subject to execution;
> >
> > (3) directing the defendant or any other party or person to take such action as the court may direct to preserve collateral security for property of the defendant levied upon or attached, or any security interest levied upon or attached;
> >
> > (4) directing the disclosure to the sheriff of the whereabouts of property of the defendant;
> >
> > (5) directing that property of the defendant which has been removed from the county or concealed for the purpose of avoiding execution shall be delivered to the sheriff or made available for execution; and
> >
> > (6) granting such other relief as may be deemed necessary and appropriate.

Pa. R. Civ. P. 3118(a)(1)-(6).

and (2) property of the debtor subject to execution,' i.e. whether Defendants owned the property

at the time of the levy."  See T. Levy Assocs., Inc. v. Kaplan, No. 16-cv-4929, 2017 WL

7693510, at *2 (E.D. Pa. Aug. 21, 2017) (quoting Marks & Sokolov, LLC v. Alexander Fin.

C.D., Inc., No. 293 EDA 2012, 2013 WL 11250212, at *3 (Pa. Super. Ct. Dec. 4, 2013) (internal

citations omitted)).

### B.      Arguments of the Parties

Plaintiffs argue that "[a]s a judgment creditor, Penn Ridge has a priority claim to any

money due and owing [Fantasy Lane] until its lawful judgment is satisfied," including the money

due and owed to Fantasy Lane pursuant to the PA-Bred program.  (Doc. No. 115 at 4.)  They

note that "[t]he [DOA] has made clear that the[] [PA-Bred] funds would otherwise have

previously been paid to [Fantasy Lane] – the judgment debtor in this Court – as the registered

owner of various horses participating in the [PA-Bred] program."  (Id. at 4.)  Had Fantasy Lane

not closed its bank account, Plaintiffs contend they "could readily seize this same money as soon

as it was paid to [Fantasy Lane]."  (Id. at 5.)  Plaintiffs further argue that Penn Ridge "stands in

the shoes of [Fantasy Lane] as to any claim it has against the [DOA as] garnishee."  (Id. at 5)

(citing Appel Vending Co. v. 1601 Corp., 203 A.2d 812, 813 (Pa. Super. 1964) (holding that "the

plaintiff in attachment proceedings stands in the shoes of the defendant as to any claim he has

against the garnishee")).  Plaintiffs therefore request that the Court "direct the [DOA] to cause

the money it is holding to be paid to [Penn Ridge] as [Fantasy Lane]'s creditor, rather than to

[Fantasy Lane] directly."  (Id. at 6.)

In response, Defendants argue that the awards currently held by the DOA, although

payable to Fantasy Lane, belong to the owners of "the broodmares and stallions which produced

offspring that were born in Pennsylvania that went on to win races at one of the tracks located in

Pennsylvania."  (Doc. No. 118 at 4-5.)  These owners include four horse-breeding partnerships, each consisting of anywhere from 25 to 75 small investors, and each with an individual employer identification number.[14]  (Id. at 6, 8-10.)  Defendants assert that when the offspring (or foal) of a broodmare wins a race, it is one of the three partnerships, as owner of the race-winning broodmare, and not Fantasy Lane, that becomes entitled to a percentage of the purse through the PA-Bred fund.  (Id. at 7.)  At the same time, Uptowncharlybrown Stallion Partnership, the owner of the stallion that sired the foal, receives a percentage of the purse as a stallion award.  (Id. at 6.)  According to Defendants, Fantasy Lane operates in the limited role of a "management company which provides management services for the owners of these horses, which includes receiving awards from the [DOA] and immediately paying them out to the horses owners."  (Id. at 2.)  In that capacity, "[w]hen one of the horses managed by [Fantasy Lane] produces an offspring," Fantasy Lane "is listed as the breeder of the foal in the registration papers that are filed with the PHBA."  (Id. at 7.)

Within this framework, Defendants assert that Fantasy Lane neither owns the horses that earned the breeder and stallion awards nor has any ownership in or "right to the[] [awards] as they belong to the owner of the broodmare," or the stallion, as the case may be.  (Id. at 7.)  Defendants maintain that, if Plaintiffs "had not taken steps to withhold the breeder and stallion awards, the award money would have been paid [to Fantasy Lane] and then immediately

---

[14] The four partnerships are: Amber Rose Partnership, the owner of a broodmare whose foal won three races, entitling the partnership to $22,193.60 in breeder awards; Kimberly Diamond Partnership, the owner of a broodmare whose foal won four races, entitling the partnership to $21,996 in breeder awards; Broodmare Partnership, the owner of broodmares whose foals won several races, entitling the partnership to $44,896.80 in breeder awards; and Uptowncharlybrown Stallion Partnership, owner of Uptowncharlybrown, the stallion who sired various race-winning foals, entitling the partnership to $26,567.80 in breeder awards.  (Doc. No. 118 at 8-10, 123.)  In all, these awards total $115,654.20 (id. at 123), although the DOA is holding $115,501 (Doc. No. 107 at 1).

distributed to the partners of the four partnerships which had earned the awards." (Id. at 10.)
Defendants highlight a spreadsheet, provided by the PHBA, that reflects the various awards
being held by the DOA and the respective partnerships to which the awards are due. (Id. at 123.)
Defendants concede that Fantasy Lane collected the breeder awards, but they argue that Fantasy
Lane itself never had any assets and always acted, in essence, as a passive intermediary through
which breeder awards were filtered from the DOA to the partnerships that own the broodmares
and stallion. (Id. at 9-11.) Defendants conclude that, "[i]n light of Fantasy Lane's lack of any
ownership interest in the awards, Plaintiffs have no basis for obtaining these awards in
satisfaction of the judgment." (Id. at 11.)

Regarding Plaintiffs' contention that Hutt closed Fantasy Lane's bank account to avoid
paying the judgment, Defendants reference Hutt's testimony that he closed the Fantasy Lane
bank account one year before the trial in this action, at which time the management company
began operating as Uptowncharlybrown Stud, LLC, for the sole purpose of capitalizing on the
notoriety of its top stallion by the same name. (Doc. No. 118 at 12.) Hutt further testified that
Uptowncharlybrown Stud, LLC, operates in the same capacity as Fantasy Lane, having assumed
management responsibility for the horses previously managed by Fantasy Lane. (Id. at 36.)

Plaintiffs advance numerous counterarguments, with a central focus on the manner by
which Fantasy Lane operated and, by the same token, Uptowncharlybrown Stud, LLC, continues
to operate. Specifically, citing to Hutt's post-judgment deposition testimony, Plaintiffs note that
Fantasy Lane: (1) had but two sources of funds, breeder awards and advances for expenses paid
by the partnerships' investors; (2) would only be able to pay the judgment using either the
breeder awards or a capital call to the investors, and Hutt testified he would not call upon the
investors to pay the judgment; (3) used the investors' advances to pay expenses, including board

16

bills; (4) used breeder awards to offset certain expenses, including food and other necessary horse-related care; and (5) paid boarding expenses directly to other farms and made no distributions to the partnerships or investors.  (Doc. No. 120 at 3-6.)  Plaintiffs reason that the partnerships' investors, as beneficiaries of the breeding and boarding contract that gave rise to this action, should be held to pay for the services rendered.  (Id. at 4.)  Any other result would, according to Plaintiffs, "be fundamentally unfair" because it would allow the investors to "effectively evade paying a rightful expense item (and, Penn Ridge Farms would then have to chase them, individually)."  (Id. at 4.)

### C.    Whether the Court Should Direct the DOA to Release the Breeder Awards to Plaintiffs

Having considered the parties' contentions, the various exhibits they provided, and Hutt's deposition testimony, the Court find that Plaintiffs have not met their burden of establishing that legal title to the PA-Bred funds is "clearly in [Fantasy Lane] as the judgment-debtor" under Rule 3118.[15]  See Greater Val. Terminal Corp., 202 A.2d at 92.  By all accounts, Fantasy Lane never

---

[15] By its terms, Rule 3118 relief is conditioned upon "notice and [a] hearing . . . ."  See Pa. R. Civ. P. 3118(a); see also State Farm Mut. Auto. Ins. Co. v. Am. Rehab & Physical Therapy, Inc., No. 03-cv-5595, 2009 WL 2096274, at *5 (E.D. Pa. July 14, 2009) (noting that "[t]he Rule . . . envisions something less than a full hearing prior to the granting of relief" (internal quotation marks omitted)).  However, as courts have observed, a Rule 3118 hearing is not always required and would, if held, yield no additional useful information or present credibility determinations for the Court to make.  See Hansen v. Hansen, No. 03-07117, 2010 WL 5657047, at *273 (Pa. Com. Pl. Aug. 31, 2010) (finding that "[t]he defendant's insistence that a Rule 3118 hearing was mandated herein is misplaced under the settled law of this Commonwealth applied to the facts of this case") (citing Gulf Mortgage and Realty Investments v. Alten, 422 A.2d 1090, 1094 (Pa. Super. 1981) (rejecting argument that appellant was wrongfully "denied the hearing required by Rule 3118, noting that, "[t]he difficulty with this argument is that there were no issues of fact for the lower court to resolve . . .")).  Here, neither party has requested or even referenced a Rule 3118 hearing, and the evidence and testimony adduced at trial, Hutt's post-judgment deposition testimony, the DOA's answers to Plaintiffs' interrogatories, and the exhibits to the parties' briefing provide sufficient information for the Court to rule on Plaintiffs' motion for supplementary relief in aid of execution without first holding a hearing.

owned the horses that earned the PA-Bred funds currently held by the DOA, nor does Fantasy Lane have any ownership in the partnerships that own the horses.  While it is true that the PA-Bred funds are <u>payable</u> to Fantasy Lane, the DOA's records reflect that the funds are owed to the "[b]reedering [p]artnership[s]."  (Doc. No. 118 at 123.)  In line with the DOA's records are Fantasy Lane's internal operating reports, which show that the PA-Funds are paid into separate accounts maintained for each partnership.  Hutt's undisputed testimony is that each partnership operates as a separate entity with corresponding employer identification numbers, partners receive Schedule K-1 forms, and tax returns are filed for each partnership.  (<u>Id.</u> at 8.)  When the PA-Bred funds were disbursed, Fantasy Lane credited the partnerships' accounts for the amounts awarded.  Thus, for example, when Charlybrown's Rose won a race in 2017, Fantasy Lane credited the account belonging to the Ambling Rose Partnership, owner of the broodmare that foaled Charlybrown's Rose, with a PA-Bred award representing forty percent (40%) of the purse.  (<u>Id.</u> at 80.)

While Fantasy Lane draws from the partnerships' accounts to pay for expenses, including boarding fees and marketing, it does so on behalf of the partnerships in the capacity of a management company.  This arrangement does not make Fantasy Lane the owner of the award-winning horses – rather, the arrangement comports with Defendants' position that Fantasy Lane is merely a manager for the partnerships and their respective horses.  Fantasy Lane's internal records reflect that it used the funds on behalf of and to further the interests of the partnerships, with the exception of relatively nominal deductions for administrative fees (<u>i.e.</u>, $300) paid to Fantasy Lane from time to time.  Nothing in the applicable statutory provisions, including the Rules of Racing, prohibits Fantasy Lane from registering horses under its own name for the purpose of receiving PA-Bred funds on behalf of the partnerships.  Indeed, partnerships are

required to file and lodge with the Commission registration papers declaring, <u>inter alia</u>: "[i]n whose name the horse is running"; "[w]ith whom the power of claiming for the partnership is resting"; and "[t]o whom winnings are payable[.]"  <u>See</u> 58 Pa. Code § 163.491(b).  In this way, the Rules of Racing envision a single person or entity as the registered breeder and owner to whom the PA-Bred funds are paid.  There is no requirement that the partnership register itself, or one of its partners, as the breeder and owner of a horse to participate in the PA-Bred program. <u>See</u> 58 Pa. Code § 163.491(b).  The statute leaves open the possibility that a management company like Fantasy Lane can register horses in its own name on behalf of the horses' owners.

Concerning Plaintiffs' claim that Fantasy Lane closed its bank account for the purpose of frustrating Penn Ridge's attempts to collect its judgment, even presuming the truth of this claim, Pennsylvania Rule of Civil Procedure 3118 does not provide relief in such a circumstance.[16] Rule 3118 does broadly empower the Court to "grant[] such other relief as may be deemed necessary and appropriate," <u>see</u> Pa. R. Civ. P. 3118(a)(6), but it "is to be used solely to maintain the status quo and not to litigate title to the property in question in the hands of a third party," <u>see</u> <u>Blue Haven Pools v. Skippack Bldg. Corp.</u>, No. 1226 EDA 2015, 2017 WL 1227101, at *11 (Pa. Super. Ct. Apr. 3, 2017); <u>see also</u> <u>Louis Dreyfus Commodities Suisse, SA v. Fin. Software Sys., Inc.</u>, No. 14-cv5995, 2017 WL 2903150, at *2 (E.D. Pa. July 7, 2017) (noting that, "[w]hile parts of Rule 3118 appear sweeping, the rule is meant only to preserve the status quo").  The Court can only grant Plaintiffs relief under Rule 3118 to the extent that title to the PA-Bred funds is clearly vested in Fantasy Lane and cannot entertain Plaintiffs' arguments that go beyond the scope of the

---

[16]  As the Court noted, <u>supra</u>, at some point, Hutt "reestablish[ed] a bank account" for "the purpose of collecting the breeder[] awards for Fantasy Lane Stable."  (Doc. No. 118 at 26.)  Hutt testified that he opened that account "solely for the purpose of processing payments from the [DOA] to the investors . . . who own the horses[.]"  (<u>Id.</u>)  The fact that Fantasy Lane had closed its account (well before the trial in this case) does not appear to have any significant relevance, as Fantasy Lane reopened an account to receive the very same disputed funds.

rule, such as their argument that Fantasy Lane closed its bank account to avoid paying the judgment entered against it.  Other such arguments advanced by Plaintiffs include that Fantasy Lane "should be estopped by its action in registering as the owner of the horses from now conveniently and transparently denying that it is the rightful recipient of this money," (Doc. 116 at 8), that it would be fundamentally unfair to Penn Ridge if the PA-Bred funds were paid out to Fantasy Lane, (Doc. No. 120 at 6), and that Hutt fraudulently transferred Fantasy Lane's assets to a Uptowncharlybrown Stud LLC, (id. at 7).  Whatever the merits of these arguments, Rule 3118 does not permit the Court to determine legal title to property based on principles of estoppel, fairness, or fraud, and Plaintiffs have not provided any authority to the contrary.  In short, the theories propounded by Plaintiffs challenge the status quo of the ownership of the funds, a matter that cannot be decided under Rule 3118.

Plaintiffs also submit that, "[e]ven if the [Fantasy Lane] 'partners' are ultimately the appropriate recipients of the money represented by the awards, they are insiders who should only be paid distributions net of amounts owed to third-party trade creditors, and certainly to a judgment creditor, such as [Penn Ridge]."  (Doc. No. 116 at 5.)  This argument is misplaced for two reasons.  First, it posits that the partners are, in essence, the judgment debtors, but Fantasy Lane is the only judgment debtor in this action.  Second, it requires the Court to make a determination (i.e., the partners are insiders) that falls outside the scope of the Court's authority under Rule 3118.  See, e.g., Randall Mfg., LLC v. Pier Components, LLC, No. 3:14-mc-346, 2017 WL 1519498, at *4 (M.D. Pa. Apr. 27, 2017) (noting that Rule 3118 does not provide for relief that would "hold a presumptively distinct third-party liable for debts of the judgment debtor," and rejecting the proposition that Rule 3118 "allows the court to reach assets of a non-party to the action or to pierce the corporate veil of a limited liability company and reach assets

of its owner").[17]  To the extent Plaintiffs argue that there is ambiguity concerning ownership of

the PA-Bred funds, the Court cannot determine "the conflicting rights to property held by third-

parties based on the limited purpose of [Rule 3118] and the summary nature of proceedings

under the rule."  See id.

The cases upon which Plaintiff relies – Witco Corp. v. Herzog Bros. Trucking, Inc., 863

A.2d 443 (Pa. 2004), and Wade v. Field & Country Meadows of Hershey, 30 Pa. D. & C. 5th

299, 2013 WL 10254277 (Dauphin Cty. C.C.P. 2013) – do not lend support to their arguments.

Witco involved a garnishee bank that accepted personal checks and cash from a judgment debtor

in exchange for the issuance of cashier checks.  See Witco, 863 A.2d at 445-446.  A threshold

issue was whether the bank had obtained "possession" of the defendant's property (i.e., the

personal checks and cash), as defined in Pennsylvania Rule of Civil Procedure 3101,[18] despite

that the funds were never deposited into the defendant's bank account.  See id. at 446.  The

Pennsylvania Supreme Court held that when the defendant "purchased 131 cashiers' checks from

the [b]ank, the [b]ank came into physical possession of the personal checks and cash."  See id.

The court also held that the bank's conduct ran afoul of Pennsylvania Rule of Civil Procedure

3111, which "restrain[s] the garnishee from paying any debt to or for the account of the

defendant . . . ."  See Pa.R.C.P. 3111(d).[19]  The facts and holdings of Witco are not particularly

instructive in the context of the instant case.  Here, the issue before the Court is whether the PA-

---

[17]  The facts of Randall are not entirely on point, as the plaintiff there sought discovery under
Rule 3118 for the purpose of piercing the corporate veil of the defendant.  See Randall¸ 2017 WL
1519498, at *4.  The reasoning is nevertheless in line with the well-settled body of case law
surrounding Rule 3118 and the limited scope thereof.

[18]  Rule 3101 provides, in relevant part, that "[a]ny person may be a garnishee and shall be
deemed to have possession of property of the defendant if the person . . . has property of the
defendant in his or her custody, possession or control[.]"  See Pa. R. Civ. P. 3101(b)(2).

[19]  The state legislature amended Rule 3101 in 2014 to insert a new subdivision (c) and
redesignate former subdivision (c) to be subdivision (d).

Bred funds are Fantasy Lane's, not whether the DOA has "possession" of the funds payable to Fantasy Lane.  Plaintiffs' attempt to liken the bank in Witco to Fantasy Lane falls short because it presupposes that the PA-Bred funds are the property of Fantasy Lane, the judgment debtor. Unlike the case at bar, in Witco, it was undisputed that the personal checks and cash that the defendant tendered to the bank were property of the defendant in the first instance.

In Wade, the county court held that a judgment creditor could garnish funds that the defendant had prepaid to the garnishee, an assisted living facility, for future expenses.  See Wade, 2013 WL 10254277, at *1.  The court held that the prepaid funds belonged to the defendant given that: (1) the facility's corporate records identified the prepaid funds as belonging to the defendant; (2) the defendant's account statements showed the funds as a credit to her account; (3) the facility had agreed to refund the prepaid funds if the defendant was removed from the facility or pay out the funds to her estate upon her death; (4) the funds were "earmarked only for future charges to be incurred by the defendant"; (5) the facility had no right to deduct any of the funds "except insofar as defendant incur[red] charges"; and (6) if the defendant terminated her resident agreement with the facility, the facility would have been obligated to pay her back principal and interest.  See id. at *6-7.  In the instant case, the evidence indicates not that the PA-Bred funds ever belonged to Fantasy Lane to use at its discretion, but that the funds belong to the various partnerships.  If anything, Fantasy Lane had the same capacity as the facility in Wade because, if the DOA disburses the PA-Bred funds to Fantasy Lane, the funds will be under the "custody, possession or control" of Fantasy Lane but nonetheless "earmarked" for payment to the partnerships' accounts.  See id. at *7 (quoting Pa. R. Civ. P. 3101(b)(2) (quotation marks omitted)).

**IV.     CONCLUSION**

Upon reevaluation of the jury's award of punitive damages in accordance with the Third Circuit's directives, the Court declines to reduce the jury's award of $89,999.  Further, because title to the PA-Bred funds currently held by the DOA is not clearly vested in Fantasy Lane, the Court will deny Plaintiffs' motion for supplemental relief in aid of execution.  An appropriate Order follows.